IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ANNA M. LEWIS,

    **Plaintiff,**

                                                      **Civil Action 2:18-cv-00677**
                                                    **Judge Sarah D. Morrison**
    v.                                      **Chief Magistrate Judge Elizabeth P. Deavers**

COMMISSIONER OF SOCIAL SECURITY,

    **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Anna M. Lewis ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Social Security Disability Insurance benefits ("SSDI"). This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 8), the Commissioner's Memorandum in Opposition (ECF No. 10), Plaintiff's Reply (ECF No. 11), and the administrative record (ECF No. 6). For the following reasons, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's nondisability finding and **REMAND** this case to the Commissioner under Sentence Four of § 405(g).

### I. BACKGROUND

Plaintiff applied for disability benefits on June 22, 2015.[1] (R. at 175–81.) Plaintiff's claim was denied initially and upon reconsideration. (R. at 1–3, 36–48.) Upon request, a

---

[1] Plaintiff indicates in her Statement of Errors that she filed her application for disability benefits on June 3, 2015. (ECF No. 8, at pg. 2.) However, the application summary in the Certified Administrative Record indicates that she applied on June 22, 2015. (R. at 175.)

hearing was held on August 25, 2017, in which Plaintiff, represented by counsel, appeared and testified.[2] (R. at 53–81.) A vocational expert also appeared and testified at the hearing. (R. at 77–81.) On December 27, 2017, Administrative Law Judge Timothy Gates ("the ALJ") issued a decision finding that Plaintiff was not disabled at any time after December 31, 2013, the alleged onset date.[3] (R. at 36–48.) On May 13, 2018, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–3.) Plaintiff then timely commenced the instant action. (ECF No. 1.)

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff testified that she is married with two daughters, ages nineteen and fifteen. (R. at 57.) She further testified that her nineteen-year-old daughter lived with her. (*Id.*) Plaintiff stated she had a high school diploma and worked as a Registered Nurse ("RN") after obtaining her degree in 1995. (R. at 58.) Plaintiff testified that she worked as an RN at a couple different facilities. (*Id.*) She further testified that sometime from 1998 to 2002 she was working at Fairfield Medical Center at one point as an RN case manager, another point as a floor nurse, and another point as a visiting nurse. (R. at 58–59.) She stated that in the visiting nurse position she "had a case load of [her] own patients that [she] saw in their homes." (R. at 59.) Plaintiff further stated that she worked as a visiting nurse from about 2002 to 2007. (R. at 60.) Plaintiff testified

---

[2] Defendant indicates in the Response in Opposition that the hearing was held on September 6, 2017. (ECF No. 10, at pg. 1.) However, the transcript of the hearing in the Certified Administrative Record indicates that the hearing was held on August 25, 2017. (R. at 53–81.)
[3] Defendant indicates in the Response in Opposition that the ALJ issued his decision on December 14, 2017. (ECF No. 10, at pg. 1.) However, the Certified Administrative Record indicates that the ALJ issued his decision on December 27, 2017. (R. at 48.)

2

that as a visiting nurse the heaviest amount of weight she lifted was "a person." (R. at 61.) She further testified that lifting a patient could involve using gait belts. (*Id.*)

Plaintiff stated that from 2007 to 2013 she worked for Fairhope Hospice as an on-call nurse from 4:00 pm to 8:00 am the following day. (*Id.*) In that position, Plaintiff testified that she "went to [a] patient's home if they were in a pain crisis" and that she "did a lot of death calls" because when someone dies "the nurse goes and takes care of the family and the patient's body and gets it ready to go wherever they've chosen." (R. at 61–62.) Plaintiff further testified that in that position the heaviest amount of weight she lifted was a person who had died. (R. at 62.)

Plaintiff stated she has not worked since 2013 because after she had her back surgery she "did well for a few months" but "then [she] woke up [on] a morning in August [2013] and all the pain that [she] had prior [returned]." (*Id.*) Plaintiff further stated that she called her doctor ("probably Dr. Degenova") who "ordered some testing." (R. at 63.) Plaintiff testified that the doctor told her that she "had an abundance buildup of scar tissue that was wrapping around nerves and . . . an area above [her] surgery was bulged or herniated." (*Id.*) Plaintiff then testified that she was sent to Dr. Meszaros, who is a neurologist. (*Id.*)

Plaintiff stated Dr. Meszaros told her she could either have a spinal stimulator implanted or she could get a continuous Morphine pain pump. (*Id.*) Plaintiff testified that she chose the spinal stimulator and a temporary one that was "30 to 50% effective" was implanted in October 2015. (R. at 63–64.) Plaintiff stated that the spinal stimulator "helped a little bit." (R. at 63.) Plaintiff then had a permanent spinal stimulator implanted in February 2016. (R. at 63–64.) Plaintiff stated she must turn the spinal stimulator "up to the max settings" for pain relief. (*Id.*) Plaintiff further stated that the spinal stimulator "hurts worse by the time [she is] done [with it]

3

than it [helps her]." (R. at 64.) Plaintiff testified that, therefore, she does not use it. (*Id.*)

Plaintiff testified that if she had the pain pump it would be "a needle going and a catheter going into one of [her] veins." (R. at 65.) She further testified that the pain pump would provide "Morphine around the clock." (*Id.*) Plaintiff stated that she is "putting that off" because she is "afraid to do it." (*Id.*)

Besides the back problems, Plaintiff testified that she has bipolar disorder which Dr. Menosky treats with medication. (*Id.*) Plaintiff further testified that the medication Latuda "seems to help a little bit" so that she is not "hiding in [her] house 24 hours a day." (R. at 66.) Plaintiff stated she is to "the extreme of . . . depression" and that it is hard for her to "do any daily activities." (*Id.*) Plaintiff testified that she must sleep in a reclining chair because she "can't lay flat" because "the nerves make [her] legs go into spasms," which she describes as "very painful." (*Id.*)

Plaintiff stated that she was able to stand in one place before needing to sit down "25 to 45 minutes at the most." (*Id.*) She further stated that "the bending . . . is impossible." (*Id.*) Plaintiff testified that when she is at a shopping mall and goes into a store then she "usually [has] to sit down for a little while" but that she doesn't "even go anymore" because "it's impossible" and "not enjoyable," but that if she does go with her kids she has to take muscle relaxers. (*Id.*)

When walking or standing, Plaintiff testified that she will "use a cart or [her] husband" for support. (R. at 66–67.) Plaintiff further testified that if she goes somewhere that she knows she will be at for a long time she uses "one of those motorized things." (R. at 67.) Plaintiff stated that she is unable to lift a case of water. (*Id.*) Plaintiff testified that she has a driver's license and will drive "short distances" every other day to places such as the gas station, her mother-in-law's place, the grocery store, and the dollar store. (R. at 68.) Plaintiff stated that her

4

daughters and husband help her with "everything," including cooking, laundry, and cleaning. (R. at 69.)

Plaintiff testified that she has problems interacting with other people because she gets "really nervous" and will "break out into . . . an anxiety attack." (R. at 68.) Plaintiff testified that for this reason she avoids crowds. (*Id.*) Plaintiff further testified the only friend she likes to socialize with is her mom and she is not involved in any clubs or organizations. (R. at 69.) Plaintiff stated that she goes to her child's school events if she can. (*Id.*) She stated that she went to her daughter's graduation but had to leave early, and that if she goes to her other daughter's softball games she would only go to part of the game. (*Id.*) In terms of interacting with others in the work environment, Plaintiff testified that she had no problem getting along with others or interacting with others. (*Id.*)

In terms of mental health, Plaintiff testified that at one point she was in therapy, but she has not "done it in a while" because "it didn't work." (R. at 71.) She further testified that to alleviate pain she will "walk around the base of [her] house" and use a heating pad, in addition to her pain medication. (*Id.*) Plaintiff stated that if she takes medication in the morning, around 1:00 pm she must "take some as needed medicine." (R. at 72.) Plaintiff further stated that if she does anything such as going to the store she takes more medicine, as well as muscle relaxers. (*Id.*) Plaintiff also testified that she must concentrate on walking or she will "trip over [her] feet" and fall. (*Id.*)

**B. Vocational Expert Testimony**

Teresa Trent testified as the vocational expert ("VE") at the August 2017 hearing. (R. at 77–81.) The VE testified that Plaintiff's past work would be described as nurse case manager and hospice nurse, which are both classified as skilled with exertional level as medium and very

5

heavy as performed. (R. at 77.) Assuming a hypothetical individual with that past work and Plaintiff's age and education, who is limited to a light exertional level, can occasionally climb ramps and stairs but never ladders, ropes, or scaffolds, can occasionally stoop, kneel, crouch, and crawl, with no exposure to workplace hazards such as unprotected heights or moving mechanical parts, with occasional interaction with co-workers and the general public, who can adapt to a routine work environment with infrequent change, without demands for sustaining past pace or strict production quotas, the VE testified that this individual would not be able to perform Plaintiff's past work. (R. at 77–78.) The VE further testified, however, that this individual could perform work as a routing clerk, inspector, and mail clerk. (R. at 78.)

Assuming a hypothetical individual of Plaintiff's age and education who is limited to a sedentary exertional level, who can stand and walk only up to two hours in an eight-hour work day, who can sit for up to six hours in an eight-hour work day, who is limited to lifting and carrying up to ten pounds occasionally but less than ten pounds frequently, who has the same postural limitations as the previous hypothetical but can only occasionally balance, who has the same environment and mental limitations as the previous hypothetical, the VE testified that this individual could perform work as a bench assembler, packager, and sorter. (R. at 78–79.)

Assuming a hypothetical individual with the same limitations as the previous two hypotheticals, but who would be absent from work two days per month, the VE testified that this individual would be precluded from work because while missing up to one day per month is typically allowed anything beyond that becomes work preclusive over a period of time. (R. at 79.) Assuming a hypothetical individual with the same limitations as the first two hypotheticals, but who would be off task greater than ten percent of the time in an eight-hour work day, the VE

6

testified that this individual would be precluded from work because anything beyond ten percent off task becomes work preclusive over a period of time. (R. at 79–80.)

### III. MEDICAL RECORDS

#### A. State Agency Evaluations

On September 10, 2015, state agency physician, Michael Delphina, M.D. reviewed the record and assessed Plaintiff's physical functioning capacity for the relevant time period. (R. at 82–95.) Dr. Delphina opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in a workday; and sit about six hours in a workday. (R. at 90.) Dr. Delphina opined that Plaintiff could never climb ladders, ropes, or scaffolds; could occasionally climb ramps/stairs or stoop; and did not have postural limitations for balancing, kneeling, couching, or crawling. (R. at 90–91.) Dr. Delphina based Plaintiff's postural limitations on her history of back pain with limited range of movement in her lumbar spine. (R. at 91.) Dr. Delphina also found that Plaintiff should avoid all exposure to hazards (machinery, heights, etc.). (*Id.*) On December 17, 2015, William Bolz, M.D. reviewed Plaintiff's records upon reconsideration and essentially affirmed Dr. Delphina's assessment. (R. at 96–110.)

#### B. Clinical Examinations and Medical Procedures

Plaintiff underwent an MRI scan on January 15, 2014 which was ordered by Martin Menosky, M.D. (R. at 320–21.) The following outlines the radiology interpretation for Plaintiff's MRI:

> The vertebrae are intact and are normally aligned. Marked disc space narrowing and disc desiccation is again seen at L5-S1 and to a greater degree at L4-5, similar to the previous exams. Type II fatty discogenic and plate narrow changes at L4-5 are again noted, the vertebrae otherwise have normal narrow signal intensity. . . .

> There is no disc bulging or protrusion or central or neural foraminal stenosis at any level . . . .
>
> At L3-4 there is some very mild broad bulging of the disc which has developed since the previous exam. . . . There is no significant neural foraminal stenosis with mild facet arthropathy again seen.
>
> At L4-5, there is a broad bulging disc which contains small annular tears laterally on both sides. Centrally there is no significant stenosis . . . . There is mild to moderate bilateral inferior neural foraminal stenosis due to bulging disc, without significant change.
>
> At L5-S1, there is interval increase in size of central and left paramidline focal extruded disc containing an annular tear. This is now extruded 6 mm posteriorly as compared to 4.5 mm on previous exam, with worsening central stenosis . . . .

(*Id.*) The following outlines the conclusions for Plaintiff's MRI:

> At L5-S1 there is a left paramidline extruded disc with an annular tear increasing in size causing slight worsening and central stenosis. . . . There is mild bilateral neural foraminal stenosis due to facet arthropathy.
>
> At L4-5 there is a broad bulging extending to the inferior neural foramina bilaterally with annular tears laterally on both sides, causing no significant central stenosis and along with facet arthropathy causing mild bilateral neural foraminal stenosis which is stable.
>
> New mild midline disc protrusion at L3-4 causing no significant central or neural foraminal stenosis.

(R. at 321.)

On February 25, 2014, Plaintiff was seen by F. Paul Degenova, D.O. at Sports Medicine Grant & Orthopedic Associates. (R. at 329–31.) Plaintiff indicated she had "terrible low back pain" and stated "that she needs to have surgery." (R. at 329.) Plaintiff further indicated that she cannot lay down to sleep and has been sleeping in a recliner for eight years. (*Id.*) Additionally, Plaintiff stated that she cannot stand for prolonged periods of time and cannot shop for more than a half hour. (*Id.*) Plaintiff also indicated that she gets numbness and tingling in her legs. (*Id.*)

8

Dr. Degenova reviewed her MRI scan from January 2014 and indicated that it showed "rather severe degenerative disk disease" and "a herniated disk." (R. at 330.)

Plaintiff was seen at Outpatient Therapy Services of Fairfield Medical Center on March 11, 2014 by Lisa Brinker, DPT. (R. at 265–66.) Dr. Brinker noted that Plaintiff complained of tingling and pain and that Plaintiff's bending and rotation abilities were decreased with pain. (R. at 265.) Plaintiff underwent the following procedures on April 9, 2014 at Grant Medical Center: decompression, posterior spinal fusion L4 to S1, Medtronic instrumentation, autograft, allograft, and transforaminal lumbar interbody fusion L4 to S1. (R. at 275–77.)

On May 9, 2014, Plaintiff was seen at Sports Medicine Grant & Orthopedic Associates by F. Paul Degenova, D.O. (R. at 328.) Plaintiff stated that "she is a lot better from surgery" and her "leg pain is gone." (*Id.*) On July 31, 2014, Plaintiff was seen by James Taylor, D.O. and F. Paul Degenova, D.O. at Sports Medicine Grant & Orthopedic Associates. (R. at 326–27.) At the visit, Plaintiff denied any pain and said "she is doing very well overall." (R. at 326.)

Plaintiff underwent another MRI scan on November 14, 2014 which was ordered by Dr. Degenova. (R. at 332–34.) The following outlines the conclusions for Plaintiff's MRI:

> Since the previous [MRI in January, Plaintiff] apparently has had extensive laminectomies at L4-5, L5-S1 and fusion of L4, L5 and S1 with pedicle screws.
>
> I see [a] large amount of enhancing tissue in the laminectomy defect. In addition, I see what could be scar tissue encasing the exiting left L5 nerve root and the traversing left S1 nerve root and just touching the traversing right S1 nerve root.
>
> In other respects, the previously described herniations particularly that at L5-S1 seems unchanged.
>
> (R. at 333–34.)

On December 4, 2015, Plaintiff was seen by Martin Menosky, M.D. (R. at 303–14.) Dr. Menosky opined that Plaintiff's cerebellar function and gait were normal. (R. at 306.) He

further opined that sensory testing for pain, light touch, position, and vibration were intact. (*Id.*)

Regarding Plaintiff's lumbar spine, Dr. Menosky opined the following:

> Inspection and palpation of the lumbar spine is within normal limits; there is no erythema, swelling, deformity or tenderness. Spinal curves are normal; there is no scoliosis. Range of motion is within normal limits. Muscle strength testing is 5/5 in all major muscle groups. Special tests for nerve root disease are negative. Decreased [range of movement] as well as pain with manipulation.

(R. at 313.) Plaintiff was seen at Sports Medicine Grant & Orthopedic Associates on December 4, 2014 by Alex O. Renshaw, D.O. and F. Paul Degenova, D.O. (R. at 324–25.) The report indicated Plaintiff was having "some difficulties postoperatively" and was "still experiencing the pain which she had before in both legs." (R. at 324.) The doctors recommended injections of Plaintiff's lumbar spine. (*Id.*)

On August 8, 2015, Plaintiff had a psychological evaluation by neuropsychologist Marc E.W. Miller, Ph.D. (R. at 341–45.) Plaintiff indicated she has "difficulty with anxiety and OCD characteristics" and "suffers from a sleep disorder." (R. at 342.) She further complained of "depression, temper outbursts, withdrawal, and moodiness." (*Id.*) Plaintiff also described having "a burning sensation to her feet." (*Id.*) Plaintiff indicated her restrictions "include excess standing, walking, lifting, stairs, and bending." (*Id.*) Dr. Miller indicated that Plaintiff "appeared to be a good informant" and "[h]er responses appeared to be credible" with no inconsistencies indicated. (*Id.*)

On January 27, 2015, Plaintiff was seen at Buckeye Spine and Rehab by Frank Meszaros, M.D. (R. at 375–76.) Plaintiff indicated her symptoms began "10+ years ago." (R. at 375.) Plaintiff described her pain in her legs as "burning, tingling, ache" and her pain in her lower back as "sharp, burning." (*Id.*) Dr. Meszaros indicated that Plaintiff was mildly restricted in her range of motion in all directions for her lower back. (R. at 376.) On February 25, 2015, Plaintiff was

again seen at Buckeye Spine and Rehab by Dr. Meszaros where she received a transforaminal epidural steroid injection. (R. at 373–74.) On March 12, 2015, Plaintiff was again seen by Dr. Meszaros at Buckeye Spine and Rehab. (R. at 371–72.) Plaintiff reported that her pain was worse after receiving the transforaminal epidural steroid injection. (R. at 371.) She rated her pain at a six out of ten. (*Id.*) Dr. Meszaros indicated that Plaintiff was mildly restricted in her range of motion in all directions for her lower back. (*Id.*) Dr. Meszaros noted that Plaintiff's MRI demonstrated some scar tissue along the nerve roots and that her symptoms remain most consistent with post laminectomy syndrome. (R. at 371–72.)

On August 14, 2015, Plaintiff was again seen at Buckeye Spine and Rehab by Dr. Meszaros. (R. at 368–70.) Plaintiff complained of bilateral leg and feet pain, as well as lower back pain. (R. at 368.) Plaintiff described her pain as "sharp, burning, aching, dull, shooting numbness." (*Id.*) Dr. Meszaros indicated Plaintiff was mildly restricted in her range of motion in all directions for her lower back. Dr. Meszaros also indicated that Plaintiff continued to have chronic neuropathic pain. (R. at 369.) On October 26, 2015, Plaintiff was again seen at Buckeye Spine and Rehab by Dr. Meszaros and Plaintiff underwent the procedure for the spinal cord stimulator trial. (R. at 366–67.) On October 30, 2015, Plaintiff was again seen at Buckeye Spine and Rehab by Dr. Meszaros. (R. at 364–65.) Plaintiff indicated she was "very happy with the pain relief she obtained during the spinal cord stimulator trial." (R. at 364.) Plaintiff estimated the trial reduced over fifty percent of her back and leg pain. (*Id.*)

On February 4, 2016, Plaintiff underwent surgery performed by Ying Chen, D.O. (R. at 405–08.) The procedure performed was a thoracic T9-T10 laminectomy with implantation of permanent dorsal column spinal cord stimulator electrodes. (R. at 405.) Dr. Chen indicated that Plaintiff had developed post laminectomy syndrome, bilateral lower extremity radiculopathy and

11

neuropathy with chronic pain management, for which she subsequently underwent the instant surgery. (R. at 408.) On August 29, 2017, Dr. Menosky completed a Physical Medical Source Statement regarding Plaintiff. (R. at 502–06.) Dr. Menosky indicated that he had known Plaintiff for over fifteen years. (R. at 502.) He opined that Plaintiff could walk less than one city block without rest or severe pain. (R. at 503.) He further opined that Plaintiff could only sit for fifteen minutes at one time before needing to get up. (*Id.*) He also opined that Plaintiff could only stand for fifteen minutes at one time before needing to sit down or walk around. (*Id.*) Dr. Menosky opined that Plaintiff could sit and stand/walk for less than two hours in an eight-hour working day with normal breaks. (*Id.*) He indicated that his opinion was Plaintiff was "incapable of return[ing] to work" and incapable of even low stress work. (R. at 503 & 505.) Dr. Menosky also opined that Plaintiff should rarely lift less than ten pounds, and never lift anything ten pounds or greater. (R. at 504.) He opined that Plaintiff should never twist, stoop (bend), crouch/squat, climb stairs, or climb ladders. (*Id.*)

## IV. ADMINISTRATIVE DECISION

On December 27, 2017, the ALJ issued his decision. (R. at 36–48.) At step one of the sequential evaluation process,[4] the ALJ found that Plaintiff had not engaged in substantial

---

[4] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

12

gainful activity since December 31, 2013, the alleged onset date. (R. at 38.) The ALJ found that Plaintiff has the following severe impairments: depressive and anxiety disorders; degenerative disc disease of the lumbar spine status-post laminectomy and fusions; post laminectomy syndrome/failed back syndrome with permanent spinal cord stimulator placement; and obesity. (R. at 38–39.) The ALJ further found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 39.)

At step four of the sequential process, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> [T]he [Plaintiff] has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) with the following additional limitations: In an eight-hour workday, the [Plaintiff] could stand and/or walk only up to two hours and sit up to six hours. She could lift and/or carry up to 10 pounds occasionally and less than 10 pounds frequently. The [Plaintiff] could occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds. She could occasionally balance, stoop, kneel, crouch, or crawl. She could have no exposure to workplace hazards, such as unprotected heights or moving mechanical parts. From a mental standpoint, she could have occasional interaction with coworkers and the general public. She could adapt to a routine work environment with infrequent change and without demands for sustained fast pace or strict production quotas.

(R. at 41.)

The ALJ concluded that Plaintiff is unable to perform any of her past relevant work as a nurse care manager. (R. at 46.) The ALJ found that considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy

---

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

See 20 C.F.R. §416.920(a)(4); see also Henley v. Astrue, 573 F.3d 263, 264 (6th Cir. 2009); Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001).

13

that Plaintiff can perform. (*Id.*) He therefore concluded that Plaintiff was not disabled under the Social Security Act from December 31, 2013, through the date of the administrative decision. (R. at 47.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. ANALYSIS

Plaintiff challenges the ALJ's decision on the basis that the ALJ failed to properly evaluate Plaintiff's impairments under medical Listing 1.04A. (ECF No. 8, at pg. 5.) The Undersigned agrees.[5]

A plaintiff's impairment must meet every element of a Listing before the Commissioner may conclude that he or she is disabled at step three of the sequential evaluation process. *See* 20 C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986). The plaintiff has the burden to prove that all of the elements are satisfied. *King v. Sec'y of Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir. 1984). The regulations provide that in making a medical equivalence determination, the Social Security Administration will "consider the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. § 404.1526(c). Nevertheless, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination rests with the [plaintiff]." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision denying benefits affirmed where medical evidence "almost establishes a disability" under Listing).

At issue here is the ALJ's consideration of Listing 1.04. Listing 1.04 provides as follows:

---

[5] This finding obviates the need for in-depth analysis of Plaintiff's remaining assignment of error which was that the ALJ failed to comply with 20 C.F.R. § 404.1527 and SSR 96-2P by failing to properly evaluate the opinions of Plaintiff's treating physician. (*See* ECF No. 8, at pg. 10.) The Court, however, encourages the Commissioner to address this contention if the Court ultimately remands the case.

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04.[6]

The Undersigned agrees with Plaintiff, that the ALJ erroneously concluded that Plaintiff's impairments did not meet or equal Listing 1.04. The ALJ found that Plaintiff's back impairment failed to meeting Listing 1.04, Disorders of the Spine and provided this rationale:

> [B]ecause the record not demonstrate compromise of a nerve root or spinal cord with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of range of motion, motor loss (muscle weakness), accompanied by sensory or reflex loss and positive straight leg raising (lumbar), spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication and the inability to ambulate effectively.

---

[6] "Pseudoclaudication is defined as 'neurogenic claudication,' which is identified as 'limping or lameness' that is 'accompanied by pain and paresthesias in the back, buttocks, and lower limbs, relieved by stooping or sitting[.]'" *Clark v. Commissioner. Soc. Sec. Admin.*, No. 2:17-0041, 2018 WL 2336318, at *4 n.7 (M.D. Tenn. May 23, 2018) (quoting Elsevier Sauders *Dorland's Illustrated Medical Dictionary* 369, 1541 (32nd ed. 2012)).

(R. at 39.)  Following this statement, the ALJ proceeded immediately to consider whether Plaintiff's obesity met or equaled one of the Listings.

A review of the ALJ's step three findings demonstrates that the ALJ did not consider all of the objective evidence in determining that Plaintiff did not meet or medically equal Listing 1.04.  In connection with Listing 1.04, the ALJ did not mention Plaintiff's January 2014 MRI that revealed an "extruded disc with an annular tear increasing in size causing slight worsening and central stenosis[,]" "a broad bulging [at L4-L5] extending to the inferior neural foramina bilaterally with annular tears laterally on both sides," and a "new mild midline disc protrusion[.]"  (R. at 321; *see also* R. at 330 (doctor's review of Plaintiff's January 2014 MRI indicated that it showed "rather severe degenerative disk disease" and "a herniated disk").)  The ALJ also did not mention Plaintiff's November 2014 MRI that revealed possible "scar tissue encasing the exiting left L5 nerve root and the traversing left S1 nerve root and just touching the traversing right S1 nerve root."  (R. at 333.)  Furthermore, the ALJ did not mention that in April 2014 Plaintiff underwent medical procedures including decompression.  (R. at 275–77.)

Additionally, clinical examinations of Plaintiff revealed possible difficulty in her ambulating effectively, which the ALJ failed to mention in his consideration of whether Plaintiff met or medically equaled Listing 1.04.  (*See, e.g.*, R. at 265 (Plaintiff complained of tingling and pain; doctor opined that Plaintiff's bending and rotation abilities were decreased with pain), 329 (Plaintiff complained of numbness and tingling in her legs); R. at 368 (doctor opined that Plaintiff had a restricted range of motion for her lower back and that she had chronic neuropathic pain); R. at 371 (doctor opined that Plaintiff had a restricted range of motion for her lower back); R. at 376 (same); R. at 503 (doctor opined that Plaintiff could walk less than one city block without rest or severe pain).)

17

Accordingly, because the ALJ failed to consider all of the relevant evidence in rendering his decision, and because Plaintiff presented specific evidence from which it was possible for the ALJ to find that she meets or equals the Listing, the ALJ was required to evaluate the evidence and articulate the reasons why the Listing was not met. The Commissioner posits that it is enough that the ALJ mentioned Listing 1.04 "and explained, however briefly, that the record did not demonstrate the criteria of the listing." (ECF No. 10, at pg. 4.) However, the ALJ's entire explanation consists of the simple statement that "the record does not demonstrate" that Plaintiff met or equaled the Listing. (R. at 39.) The remainder of the ALJ's finding on this consists of a recitation of the Listing itself. This explanation is simply insufficient. *See Holland v. Massanari*, 152 F. Supp. 2d 929, 934 (W.D. Tenn. July 13, 2001) ("[T]he ALJ's findings should be as comprehensive and analytical as feasible, and should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis for the ALJ's decision. . . . Otherwise, the reviewing court is unable to properly exercise its responsibility under 42 U.S.C. § 405(g) to determine if the Secretary's decision is supported by substantial evidence.") (citations omitted).

Requiring the ALJ to articulate his reasons at step three "is not merely a formalistic matter of procedure, for it is possible that the evidence [Plaintiff] put forth could meet this listing." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). "In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.0[4] of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Id.* (citations omitted). Because the ALJ failed to sufficiently articulate his reasons or evaluate

all the evidence, the Undersigned finds that the ALJ did not properly evaluate Plaintiff's impairments under Listing 1.04A.

## VII. CONCLUSION

Due to the error outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g). Accordingly, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## **PROCEDURE ON OBJECTIONS**

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed,

appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

**Date: July 8, 2019**                              */s/ Elizabeth A. Preston Deavers*
                                                   **ELIZABETH A. PRESTON DEAVERS**
                                                   **CHIEF UNITED STATES MAGISTRATE JUDGE**